# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# HELENA DIVISION

JOSEPH M. WILLARD
ADC # 127631                                                                                    PLAINTIFF

V.                                    2:08CV00024 WRW/HDY

RAY HOBBS, Chief Deputy Director, Arkansas
Department of Correction; EDDIE SENSAT, Administrator
of Religious Services, Arkansas Department of Correction;
DENNIS WILSON, Chaplain, East Arkansas Regional
Unit, Arkansas Department of Correction; and GREG
HARMON, Warden, East Arkansas Regional Unit,
Arkansas Department of Correction                                              DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATIONS

### INSTRUCTIONS

The following recommended disposition has been sent to United States District Court Judge William R. Wilson, Jr. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than eleven (11) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or

additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1. Why the record made before the Magistrate Judge is inadequate.

2. Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3. The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

## **DISPOSITION**

Plaintiff filed this action, pursuant to 42 U.S.C. § 1983, alleging that he has been denied free expression of his religious beliefs. An evidentiary hearing was held in this case before the Court on April 28, 2009. Following the presentation of testimony by the parties and witnesses, and the submission of post-trial briefs by each side (docket entries ## 140-41), the preponderance of the evidence causes the Court to make the following recommendations of findings of fact and conclusions of law:

## I.  Facts

Plaintiff, who has served six and a half years in the Arkansas Department of Correction, has been housed at the East Arkansas Regional Max Unit, where the events giving rise to this litigation occurred, since November 2006.  Plaintiff is a Wiccan and he filed this action because of the allegedly unconstitutional denial of certain items he says are an essential part of Wiccan worship.  The issue before the Court is whether the denial of sea salt, an altar cloth, a ritual feather, essential oils, a ritual bell, and a special notebook or binder for creating a "Book of Shadows" violates Plaintiff's First Amendment right to the free exercise of religion and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  The Defendants are Ray Hobbs, chief deputy director of the Arkansas Department of Correction; Eddie Sensat, the administrator of religious services; Chaplain Dennis Wilson, and East Arkansas Regional Unit Warden Greg Harmon.  They have challenged Plaintiff's claims on their merits as well as for failure to exhaust administrative remedies.

Plaintiff testified that he is housed in the "Max" section of the East Arkansas Regional Unit, in administrative segregation, and was told by Defendant Wilson that as a max security inmate, he could not be allowed to possess the ritual feather that he requested because of the security risks that it might present. As for the altar cloth he sought, he was told to use a towel or other permissible fabric as a substitute. According to Plaintiff, the Arkansas Department of Correction does permit the possession of ritual bells, but the one that was mailed to him "from his church" was never delivered to him because it did not meet the security requirements of the Department.  Plaintiff testified that Defendant Wilson did give him an individual serving packet of salt on one occasion, telling Plaintiff that the "central office" had authorized him to have it, but no more packets have been provided with any regularity.  He adds that the notebooks available for purchase at the commissary

are not convenient for creating his "Book of Shadows" because he needs to be able to re-arrange the pages.

Plaintiff testified that without these items, he "simply cannot practice his religion," and that no reasonable alternatives exist. Plaintiff argued that other inmates are allowed to possess similar items, such as the Muslim inmates' prayer rugs; therefore, he is being discriminated against because he is a Wiccan. Plaintiff also introduced into evidence a list of commissary items available to purchase by the inmates, to illustrate his claim that other items, very similar to those he is seeking, are available and permitted. Lastly, Plaintiff testified that Defendant Wilson's references to God and Christ, such as signing his memos with a salutation of "Be blessed," or saying "God be with you," "offends" him and proves that the Defendants are acting in a discriminatory manner.

Plaintiff's witness Michael Long, a former inmate who was in the custody of the Arkansas Department of Correction for approximately one year and is also a Wiccan, testified that he was also denied religious artifacts, including the bell, salt, and altar cloth that Plaintiff seeks. Long also stated that he knew of no other Wiccan-practicing inmates who were permitted such artifacts. His attempt to keep a Book of Shadows, which he described as the "Wiccan equivalent of the Christian Bible" and a place to write down rituals so that the Wiccan can repeat them in the same way each time, was confiscated as "clutter." Long described himself as a solitary practitioner who was not part of a coven. According to Long, the altar cloth is a "focal point for ritual" that was especially important for rituals in the maximum security unit where Wiccans may only practice alone. He added that he uses a stone (instead of a feather) to "focus his energy" and said that salt was used to "make holy water" and oils to "consecrate," although what would be consecrated remained unclear. Long testified that the practice of his religion was "hindered" at East Arkansas Regional Max Unit and he

was often forced to "break prison policy" in order to worship in the manner he desired. He described "buying" salt from an inmate who worked in the chow hall as an example of his being "forced" to break prison rules in order to practice his religion. Long believed that not having certain items - especially a dedicated altar cloth – was a "burden" that made it "impossible" to worship, as there were no reasonable substitutes available.

Inmate Richard Tucker, a Wiccan who has been housed at the East Arkansas Regional Unit in both the "max" unit and in general population, testified that his requests for salt, a feather, and an altar cloth had been similarly denied. Tucker described an "altar cloth" as a thin cloth, either a 16" square or an 18" x 32" rectangle, with a design and sometimes tasseled edges.

According to Tucker, despite Arkansas Department of Correction regulations which permit possession of a Book of Shadows, he did not keep one himself because of the difficulty of trying to use a commissary writing tablet for the purpose. Tucker does, however, possess a silver ritual bell, which he obtained with the assistance of Defendant Bell, and a "Wiccan Bible." He described some of the substitutions he has made in his own practice, such as using photos of lighted candles in lieu of the real thing, but the lack of other items is a "real burden." A towel is not an adequate substitute for a proper altar cloth, Tucker believed, because an altar cloth should be "pure" and "imbued with the energy of the worshipper."

Plaintiff also called as witnesses Tiffanye Compton, the Arkansas Department of Correction's grievance supervisor, and Unit "problem-solver" Sgt. Henry Williams. The defense presented testimony by A. Miriah Bruce, Chaplain Alvin Don Yancey from the North Central Unit, Security Manager Jeremy Andrews, and Defendants Sensat, Wilson, Harmon and Hobbs. Plaintiff has challenged the right of the Defendants to call witnesses who were not timely disclosed in discovery,

and the Defendants have argued that Plaintiff's claims should be dismissed for failure to exhaust administrative remedies. Plaintiff has not been prejudiced by any failure on the part of the Defendants to timely disclose the names of witnesses. Nevertheless, the Court will not rely upon the testimony of Chaplain Yancey in making its findings, nor any testimony from the witnesses or parties regarding events that occurred at other units. Furthermore, the findings in this case which will be set forth *infra* do not require resolution of the question whether Plaintiff fully completed the exhaustion requirement, so the following statements regarding the testimony do not include the evidence offered by either party on the question of administrative remedies.

Defendant Chaplain Sensat testified for the defense that the Arkansas Department of Correction does not recognize, nor discourage, any religions. While the Department does not presently have any active Wiccan "Certified Religious Assistants," he attributed this to the difficulty of locating and recruiting Wiccan leaders. Therefore, there are no formal religious services for Wiccan inmates because the Department's Religious Services policy (Defendants' Exhibit 12) requires the presence of a free-world sponsor or the Chaplain for holding services. Additionally, because Plaintiff is in administrative segregation, the religious policies on permissible personal items are more restrictive than those policies applicable to inmates in the general population.

On cross-examination, Defendant Sensat agreed that some altar cloths might be acceptable within the security parameters. However, according to the Sensat the specific one that Plaintiff sought was 36" square. This was determined by the reviewing security committee to be too large and therefore susceptible to misuse in ways not comparable to the Muslim prayer rug. Most of the Islamic inmates at the East Arkansas Regional Unit - twenty to thirty inmates - do have prayer rugs, approximately 24 x 18 inches. However, Defendant Sensat qualified this statement by noting that

he was not aware of any permitted use of prayer rugs in restricted areas, such as punitive isolation and administrative segregation, where Plaintiff is housed. As for his memos signed "Blessings in Christ," he stated that this was simply part of a form signature attached to his memo templates and was not meant to suggest disrespect of any other religions.

Defendant Greg Harmon testified that ritual feathers were not allowed in the prison units because the long pointed quill can be sharpened to use as a weapon. Salt was no longer permitted anywhere in the Arkansas Department of Correction, both for health reasons and for the security concerns raised by salt's corrosive effects on metals, such as locks. Harmon also testified about how inmates have been known to overpower guards by throwing salt into their faces and eyes. As for the altar cloth, "for the inmate, the possibilities are endless," including using it to choke a guard.

Defendant Harmon explained that while some metal items are allowed, and even sold in the commissary, the Department tries to limit the amount of metal available to the inmates, especially those in the maximum security areas – where Plaintiff is housed. The ritual bell that Plaintiff complains of not having received was not ordered through the prison chaplain; instead, it was sent to him in the mail from an unknown source and "implicated other specific security concerns," particularly because of the thickness of the metal. Plaintiff's request for "essential oils" was denied because of the flammability of the substance. According to Harmon, no inmates are permitted to possess oils because of safety concerns, not because of any religious discrimination.

On cross-examination, Defendant Harmon rejected Plaintiff's comparison between Muslim inmates' prayer rugs, which are permitted, and the altar cloth he has requested – not only because Harmon found there were not similar safety concerns with the prayer rugs, but also because Plaintiff is not in general population. According to the Department's Policy and Procedures on "Special

Management Inmates," (Defendants' Exhibit 9) the personal items permitted include only two religious texts.  Prayer rugs are specifically not permitted in punitive segregation.  Defendant Harmon said that Plaintiff might be allowed to have his altar cloth and perhaps even other items *if he were in general population.*

Defendant Hobbs testified that the issues as he saw them were simply a question of safety and security versus Plaintiff's rights, explicitly denying that any decisions made were based on religious discrimination.  Anything, he observed, "can be used incorrectly" by the inmates.  The Muslim inmates' prayer rugs are woven, and not easily torn apart like cloth can be, so therefore do not pose as great a security risk.  However, Hobbs added, Muslim inmates too are told that a towel can be a substitute for the prayer rug and some do so.

Lastly, Jeremy Andrews, a manager of security for the Department for approximately 18 years who is responsible for field operations and building security, testified to the specific security concerns raised by each of the items sought by the Plaintiff.  "Essential oils" are also flammable oils, and their slippery consistency can be used to assist inmates in slipping out of handcuffs or making a floor slippery to disable a guard.  Unlike body oils that are available in the commissary, essential oils of the type requested by Plaintiff are not absorbed into the skin.  Andrews opined that all of these issues are of even greater concern in the Max security units, where Plaintiff is housed.

According to Andrews, salt has been eliminated in all of the units because inmates can disable guards or other inmates by throwing sand in their eyes, and because the corrosive effects have been utilized by inmates to corrode metal - such as in window sills or locks.  Similarly, because of concerns of gang activity, any possession of excess colored cloth is restricted.  Inmates may use color cloth by removing the dye or simply to show gang affiliations.  Thus, Plaintiff's requested altar cloth

would not be permitted. Andrews expressed concern, too, that an altar cloth could be used to block a door or window, to clock ventilation areas, or to jam locks. When confronted with Plaintiff's argument on cross-examination that bedsheets could be used in these same ways, Andrews responded that the Arkansas Department of Correction requires that inmates have sheets. As a security specialist, he "didn't especially like [sheets], either," but had to permit them, although they too would be confiscated if misused.

**II. Analysis**

Prison inmates retain constitutional rights protected by the First Amendment, including the right to free exercise of religion. *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). These rights are limited, however, by the fact of incarceration and valid penological objectives, such as deterrence of crime, rehabilitation of prisoners, and institutional security. *Id*., cited in *Fegans v. Norris*, 537 F. 3d 897, 902 (8th Cir. 2008). The evaluation of penological objectives in this context is "committed to the considered judgment of prison administrators," and to ensure appropriate deference to those judgments, courts review prison regulations alleged to infringe constitutional rights under a "reasonableness" test that is less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights. *Id.*; *see also Turner v. Safley*, 482 U.S. 78, 87-91 (1987).

Congress has granted additional protection for religious exercise by institutionalized persons. The Religious Land Use & Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq*., enacted in 2000, succeeded a similar statute, the Religious Freedom Restoration Act ("RFRA").[1] RLUIPA, like RFRA, provides that no government shall impose a "substantial burden" on the

---

[1] The Religious Freedom Restoration Act was held unconstitutional, as an invalid exercise of Congress's power under the Fourteenth Amendment as it applied to the States. *City of Boerne v. Flores*, 521 U.S. 507 (1997).

religious exercise of an inmate, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1. The Supreme Court has observed that "context matters" in the application of this "compelling governmental interest" standard, and that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). In *Fegans*, *supra*, the Eighth Circuit held that, "Indeed, the Court noted that lawmakers who supported RLUIPA were 'mindful of the urgency of discipline, order, safety, and security in penal institutions,' [*Cutter*]. at 723, 125 S.Ct. 2113, and expected that courts would apply the Act with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' *Id*. (quoting 146 CONG. REC. S7774, S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy on RLUIPA))." *Fegans* at 902.

### A. Equal Protection claims

In order to establish an equal protection claim, a prisoner must show that he is treated differently from similarly-situated inmates and that the different treatment is based upon either a suspect classification or a "fundamental right." *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1016 (8th Cir. 2006), *cert. denied*, 550 U.S. ___, 127 S.Ct. 2128, 167 L.Ed.2d 862 (2007); *Weiler v. Purkett*, 137 F.3d 1047, 1052 (8th Cir. 1998). Religion is a suspect classification. *Weems*, 453 F.3d at 1016. Plaintiff must show that the decision to refuse him these items was motivated by intentional or purposeful discrimination. *See Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007); *Phillips v.*

*Norris*, 320 F.3d 844, 848 (8th Cir. 2003). "Nevertheless, prison officials may restrict the religious practices of inmates only if such deprivation is necessary to further legitimate penological interests." *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999); *see also Thomas v. Gunter*, 103 F.3d 700, 703 (8th Cir. 1997).

Plaintiff's argument on this issue focuses on the perceived similarities between his altar cloth and the prayer rugs permitted to Muslim inmates. *Rouse* held that the analysis turns on whether "other inmates following other religions [have been] similarly limited . . ." *Rouse* at 943. The evidence presented at the hearing shows that, of the various religious articles permitted in Arkansas Department of Correction Policy No. 625 (Defendants' Exhibit 7), only the Wiccan inmates are allowed to possess multiple items. The laundry list of permitted items include: "The "Book of Shadows," small bell (not to exceed 1 ½" tall), chalice (not to exceed 6" tall, made of a non-hazardous material and less than $50 value), and a religious text." The only other permissible religious artifacts (to be kept by the individual inmate, as opposed to congregational use) are a religious medallion necklace, the Muslim prayer rug, a ceremonial headdress, and rosary beads.

In 2006 this list was amended by an Ad Hoc Committee recommendation (Defendants' Exhibit 22) to address inmate requests for other items. Wiccans' requests for altar cloths, small wands, and quartz crystal were disfavored, based on security concerns. Jewish inmates' requests to be allowed the "Tallit Katan," a fringed undergarment worn by Orthodox Jews, and Tallis, or prayer shawls, were similarly denied. Like the altar cloth, a towel was called a "suitable substitute" for the Tallis. The Tallit Katan, the prayer shawl, and Plaintiff's proposed altar cloth are items made from cloth, and the concerns offered regarding the prayer shawl – that it could be used to cover the head and shoulders to hide one's appearance, or dye extracted from the colored fabric to color other

clothing items – echo those objections to Wiccan altar cloths. Under the circumstances, it appears that the more analogous comparison is between these cloth and fabric items, not to a prayer rug woven of carpet fibers. And, for purposes of the *Rouse* analysis cited above, it also appears that Jewish inmates are "similarly limited" by the Arkansas Department of Correction policies on permitted religious articles.

However, even assuming that Plaintiff has been treated differently from similarly-situated inmates, "official action will not be held unconstitutional solely because it results in a ... disproportionate impact. . . . Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)(footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991). Evidence which merely indicates disparity of treatment or erroneous or even arbitrary administration of state powers rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).

Plaintiff has not presented any evidence suggesting that the Arkansas Department of Correction Defendants acted with a discriminatory purpose. Accordingly, the Court recommends a finding that there is not sufficient evidence to support a finding of purposeful discrimination.

**B. Free Expression claims**

While prisoners retain their constitutional rights, they are subject to limitations on those rights "in light of the needs of the penal system." *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982

(8th Cir. 2004), *cert. denied*, 543 U.S. 991 (2004). An inmate's constitutional claims are evaluated under a lesser standard of scrutiny, even though such claims would receive strict scrutiny analysis if brought by a member of the general population. *Id.* "A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.' " *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). We consider four factors in making this determination: (1) "whether there is a 'valid rational connection' between the prison regulation and the government interest in justifying it"; (2) "whether there is an alternative means available to the prison inmates to exercise the right"; (3) "whether an accommodation would have a 'significant' 'ripple effect' 'on the guards, other inmates, and prison resources' "; and (4) "whether there is an alternative that fully accommodates the prisoner 'at de minimis cost to valid penological interests.' " *Id*. at 982-83 (quoting *Turner*, 482 U.S. at 89-91). With regard to the second factor, "[a] prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." *Id.* at 983.

Prison inmates retain constitutionally-protected rights, but the rights are subject to limitations "in light of the needs of the penal system." *Gladson*, 551 F.3d at 831. "These rights are limited, however, by the fact of incarceration and valid penological objectives, such as deterrence of crime, rehabilitation of prisoners, and institutional security." *Fegans* at 902. The United States Supreme Court has held that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Turner*, 482 U.S. at 89. Accordingly, great deference is accorded to the judgment and expertise of prison officials, particularly regarding decisions that implicate institutional security. *Goff v. Graves*, 362 F.3d 543,

549 (8th Cir. 2004).

The Court finds that the Defendants clearly have a legitimate penological interest in regulating an inmate's use of religious items to preserve the safety and security of the Department. The Defendants have established that the prohibited Wiccan religious items pose a threat to the order and security of the prison. The second *Turner* standard asks whether Plaintiff has another way to exercise his constitutional right to practice his religion. To accommodate his religious needs, the Arkansas Department of Correction regulations on the matter provide that Wiccan inmates may have the "Book of Shadows," a small bell, a chalice, and a religious text. The Defendants have denied Plaintiff sea salt, essential oils, a non-conforming bell, and a dedicated altar cloth (as opposed to a substituted towel) on well-articulated security grounds, particularly as applied to an inmate on administrative segregation status, but did provide Plaintiff with some substitutes for items that pose threats to the internal safety of the prison. Plaintiff's witness, Michael Long, testified that he used a rock instead of a ritual feather in his worship, indicating that use of a feather is not a "fundamental tenet" of the Wiccan faith and that other items may be used to "focus his energy" during rituals. The Court finds that Plaintiff clearly has alternative methods of practicing his faith by using substitute items as part of his ritual.

The third *Turner* standard requires the Court to evaluate the impact that the accommodation of Plaintiff's right to practice his religion would have on guards and other inmates. The Court finds that the accommodation could have a significant impact on the security of other inmates and guards, and on the internal safety of the prison. The use of salt, for instance, when the substance has been banned from all units in the Department, could necessarily result in a black-market for the mineral amongst other inmates. No inmates are allowed to possess oils, according to the defense witnesses,

not only because of their inherent flammability but also because of the security concerns that they can be used to slip handcuffs or create slippery floors.  Altar cloths, like the prayer shawls discussed above, may find a myriad of uses that create security threats, not the least of which include self-injury or injury to guards or other inmates.   The ritual feather sought by Plaintiff here could be converted to a weapon by sharpening its point, a similar concern expressed in the policies for not permitting wooden wands.[2]  "When the accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. Accordingly, the Court defers to the informed discretion of the Defendants as to the safety and security threats created by inmates using these items during religious services.

The fourth *Turner* factor asks whether there are alternatives that fully accommodate Plaintiff's right to practice his religion at *de minimis* cost to valid penological interests. The Defendants have previously provided substitutes for sea salt (when table salt was still permitted at

---

[2]  Plaintiff has argued and presented evidence that other, similar items, are permitted to the inmates and are available for purchase in the commissary.  The Court is not persuaded by this, however, because the argument misses two fundamental points: first, simply because one item is authorized does not necessarily mean that a "similar" item is either so similar or so innocuous as Plaintiff wishes us to believe.  For instance, some items made of metal are available to inmates.  Other restrictions are in place to limit the number and source of non-essential metals in the prison.  Some "metal" items are more necessary than others, or more difficult to eliminate.  That does not warrant the opposite extreme of allowing all metal items into the units.  Quite the contrary, those metals impossible to remove from the prison setting justify a more cautious view of discretionary metal objects.
    A second point that should be made is that while Plaintiff himself probably has no nefarious plans for these items he seeks, it is quite possible that any of them, from the ritual feather to the altar cloth to the essential oils, could impermissibly land in the hands of other inmates who do have plans to use them in such a way that would create security concerns.  The responsibility of the Defendants is to guard against risk and harm by all of the inmates, not simply Plaintiff.

the units), and have indicated that Plaintiff would be permitted to possess a ritual bell if he would work with the administration to order an item that comports with the requirements of the Arkansas Department of Correction policy. And there is no question that, however inadequate Plaintiff may find them to be, there are writing materials available for use in creating a Book of Shadows. The Court finds that the Defendants have provided adequate alternatives to the prohibited items.

The Court further finds that under *Turner,* the Defendants have a legitimate penological interest in protecting the safety and security of staff and inmates by prohibiting the use of dedicated altar cloths, ritual feathers, sea salt, and non-conforming bells, and recommends a finding that Plaintiff has failed to carry his burden of establishing that the Defendants violated his First Amendment rights.

### C. RLUIPA claims

Plaintiff also alleges the Defendants violated RLUIPA, 42 U.S.C. § 2000cc-1, by denying him these key religious items. An inmate's claim under RLUIPA is subject to review under a different standard than a First Amendment claim. "'By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims.'" *Gladson*, 551 F.3d at 832 (quoting *Murphy*, 372 F.3d at 986). RLUIPA provides, in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>   (1) is in furtherance of a compelling governmental interest; and
>   (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The Eighth Circuit Court of Appeals has defined "substantial burden" as

meaning that the government action "must significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." *Murphy v. Mo. Dep't of Corr.*, 506 F.3d 1111, 1115 n. 7 (8th Cir. 2007).

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). While the government must meet a higher burden in RLUIPA claims than for First Amendment claims, the Court affords "'a significant degree of deference to the expertise of prison officials in evaluating whether they met that burden.'" *Gladson,* 551 F.3d at 832 (quoting *Murphy,* 372 F.3d at 987).

The Court has determined that the regulations and their enforcement are reasonably related to legitimate penological objectives of maintaining prison security, and that the regulations satisfy the lesser burden of proof under the First Amendment. The Defendants have allowed Plaintiff to possess some personal religious items which they have determined are not safety hazards. With respect to the religious items that are safety hazards, the Defendants have provided substitutes which the Court determines to be adequate alternatives.  The Court finds that Plaintiff has not shown that the denial of a dedicated altar cloth, sea salt, essential oils, or a non-conforming bell created a substantial burden on the exercise of his religion.

Moreover, even if this were not the case the Defendants have demonstrated that the imposition upon Plaintiff's rights is in furtherance of a compelling state interest and is the least restrictive means of furthering that compelling governmental interest.  Safety and security issues are

of the most compelling of state interests, and the evidence presented by the Defendants satisfies the Court that these issues are valid with respect to the items sought by Plaintiff, and no less restrictive measures exist to protect those interests.

As a result, the Court finds that Plaintiff has failed prove that the Defendants have violated RLUIPA and accordingly recommends that his Complaint be dismissed with prejudice.

## CONCLUSION

For all these reasons,

IT IS, THEREFORE, RECOMMENDED that Plaintiff's Complaint (docket entry #2) be DISMISSED with prejudice, and the requested relief be DENIED.[3]

DATED this    23    day of July, 2009.

_____
UNITED STATES MAGISTRATE JUDGE

---

[3] The Defendants' pending Motion for Judgment on the Pleadings (docket entry #120) should be DENIED as moot based on the foregoing findings and recommendation following the evidentiary hearing.